UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Dkt No.: 24-CR-10101-JEK |
| | ) |
| JOHN REARDON | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

John Reardon appears before this Court to be sentenced for his crime. He has plead guilty to an information charging three counts – Obstruction of Free Exercise of Religious Beliefs, by Threat of Force, 18 U.S.C. §§ 247(a)(2) and (d)(3), Transmitting in Interstate and Foreign Commerce a Threat to Injure a Person, 18 U.S.C. § 875(c), Stalking Using a Facility of Interstate Commerce, 18 U.S.C. § 2261A(2)(B).

Mr. Reardon's crime was terrifying, deeply hurtful, and will cause lasting fear in the victims. Despite the seriousness of the offense, we ask the Court to impose a sentence of 9 months, with 5 years of supervised release to follow. We make a request for this significant variance from the guidelines because of the two co-occurring factors led to the commission of this crime – 1) Mr. Reardon's long standing mental health problems and 2) the two-year long conflict between the state of Israel and leaders of Hamas in Palestine, playing out on a global stage. Mr. Reardon does not have affiliation with white supremacist or neo-Nazi organizations. His record demonstrates that when his mental health is strained, he acts out verbally with phone calls, threats, or the escalation of disputes. That history, however, was unknown to the people who received the threatening phone calls. Those people, the victims in this case – Rabbi's, Consulate staff, members of the temples who received the phone calls – those people responded

appropriately by assuming that Mr. Reardon was amongst the worst of the worst type of people, capable of carrying out the threats that he made.

What the Court has before it now is a robust record of Mr. Reardon's mental health history, the impact of his actions on the victims, and the benefit of being able to view this case from all of these perspectives to find a just and fair punishment. This record shows that Mr. Reardon is not amongst that 'worst of the worst' type of people who organize to enforce principles of white supremacy.

In recognition of the harm of his offense and consistent with his acceptance of responsibility for this crime, Mr. Reardon respectfully asks this court to impose the longest sentence he has ever served: 9 months of imprisonment, to be followed by five years of supervised release with the standard and special conditions outlined in his Presentence Report ("PSR"), particularly condition #3 involving community service. While short of a guideline sentence, Mr. Reardon submits that this sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a), as it appropriately reflects and considers the nature and seriousness of his offense, his personal history and need for meaningful treatment, and provides for significant specific and general deterrence. Although this sentence (and the recommendation from the Government in the parties' plea agreement) represents a downward variance from the sentencing guidelines, it is sufficient, but not greater than necessary, to effectuate the purposes of sentencing here. *United States v. Kimbrough*, 552 U.S. 85 (2007); *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

## **NATURE AND CIRCUMSTANCES OF THIS OFFENSE**

In January 2024, John Reardon spent his time alone in the motel room he has lived in for the last 2 years. The room small, it has a bed, microwave, television, one light and a window overlooking the parking lot. He could not even leave the blinds open as anyone walking through the parking lot could see inside. He was not working. Shortly after Christmas, he suffered the loss of a close friend who took their own life. On January 20, 2024 his friends from childhood ▮▮▮▮▮▮▮▮▮▮ (brothers) both died, hours apart from each other. He lost these three close friends within days. He became deeply depressed and stopped taking his psychiatric medications (specifically, ▮▮▮▮▮▮▮▮▮▮ He spent his time captivated by the 24-hour news coverage of the ongoing conflict in Gaza. He has followed this closely since the attack in a Jerusalem nightclub, by Hamas, on October 7, 2023. The images on the news are now commonplace, young adults killed while celebrating, children starving, devastation of communities, and more recently, entire cities facing starvation. These images are hard to watch for even the most hardened news viewer. For a person with lifelong mental health problems, the effect can be catastrophic.

What Mr. Reardon did forever haunts him – he picked up the phone and started making calls. He called Synagogue 1 & 2, as described in ¶¶ 12-21 and left horrific voicemails. From the moment of his first appearance in court, he has only wanted to plead guilty and apologize for his abhorrent conduct.

Independently from these voicemails, Mr. Reardon called the Israeli consulate over and over. The voicemails he left there, described in ¶¶ 21-24 were no less caustic or terrifying, particularly as hate crimes against Jewish people has been on the rise in recent years.

What makes this crime unique as compared to the many other threats cases brought after similar conduct was directed at synagogues or other Jewish community centers[1], is that Mr. Reardon has absolutely no history of association with white supremacist or neo-Nazi organizations. He has never engaged in threatening behavior to any other type of house of worship or organization aligned with people of color or religious minorities, and never to a Synagogue or offices related to the State of Israel before October 7, 2023.[2] His choice to make all of the calls and threats came directly from watching the conflict in Israel play out on national television.

## BACKGROUND AND HISTORY OF JOHN REARDON

John Reardon is the youngest of three sons, raised in a two-parent home, with adequate but relatively meager means. He graduated from high school and college but has struggled to use his academic successes to find meaningful, stable employment. He has spent almost his entire life living at home with his parents, including acting as their caretaker as they aged. He has lost contact with his brothers, largely due to conflict around the care of their parents. In 2015 his mother passed away, his father in 2019. He was unable to continue living in their house after the home was divided amongst the three children.

Mr. Reardon's employment has been held back because he has never been able to use his bachelor's degree to further his employment prospects. For many years, primarily as a hobby, he worked setting up large music events around eastern Massachusetts. He loves music and the creative, expressive people he met in that world. He did this while working in the commercial cleaning industry and living with (and caring for) his parents. After their passing, there was

---

[1] *Antisemitic Terrorism,* Broughton, J. Richard, Symposium, 27 Lewis & Clark L. Re. 1105 (2024)
[2] This is particularly noteworthy because Mr. Reardon does have a history of having outburst in public settings. PSR ¶ 73.

4

simply no way to turn his love of music into a career that could support him financially. He then lived in a sober living environment, run by the Southern Middlesex Opportunity Council (SMOC), and received services there, but over time had increasing conflict with neighbors. He worked at SMOC for approximately 2 years, but again, had significant conflict with colleagues and was ultimately forced to leave. It was around this time, 2016, where he was civilly committed, following an incident in a bank.[3] In 2020, he was committed a second time. Over the course of the years since he lost his parents, he has lost his housing, his employment, and was subjected to the terrifying process of multiple involuntary civil commitments, all while his physical health deteriorated.

Fortunately, Mr. Reardon was able to find semi-permanent housing at the Arbor Inn, owned and operated by the Patel family, primarily Janak (Jack) & Hassumati Patel. The family has taken Mr. Reardon in and offered him some stability. He has rented a room there since 2023. He often pays the rent with barter – he drives the elderly Patel grandparents to and from medical appointments when they come from India to the United States. Despite the kindness bestowed upon him by the Patel family, Mr. Reardon has lived for years on the precipice of financial collapse. He has most of his belongings in a storage facility as they cannot fit inside a motel room. He had some success working for Door Dash but now cannot have a contract there any longer. He sells belongings from storage a few times a month at local flea markets in order to have some spending money. The probation department even paid several weeks of his rent before his detention in April 2025.

*Medical and Substance Use History*

---

[3] We attach an excerpt from the 2016 commitment records.

Mr. Reardon's medical issues are severe, chronic and debilitating. PSR ¶¶ 88-91. Mr. Reardon suffers from cervical and spinal lumbar radiculopathy, spinal stenosis, hypertriglyceridemia, Type-2 Diabetes, hypertension arthritis affecting both of his knees, kidney stones, renal and splenic cysts, Barrett's esophagus, a very recent positive screening test for prostate cancer (requiring immediate follow-up colonoscopy), and arthropathy of the lumbosacral facet joint. In addition, he has a ventriculoperitoneal (VP) shunt in his brain. This is a cerebral shunt that drains excess cerebrospinal fluid (CSF) when there is an obstruction in the normal outflow or there is a decreased absorption of the fluid. Cerebral shunts are used to treat hydrocephalus. This shunt was placed in Mr. Reardon's brain several years ago.

Mr. Reardon's substance use is linked to his pain management. He has periodically used opioids to manage the chronic pain from these severe disorders. However, he has concerns about the impact of opiates on his body and the potential for addiction. As a result, when in the community he has used marijuana to manage the pain.

*Mental Health Issues*

Mr. Reardon's mental health symptoms are at the root of this offense. Mr. Reardon has been diagnosed with depression, but also struggles with anxiety, impulsivity, and difficulty controlling his anger.

In a note from his therapy records, from Advocates, from August of 2024, his therapist writes:



He has sought and received therapy for years, including throughout the pandemic at the Southern Middlesex Opportunity Council, where his goals in October of 2021 were:



The combination of these factors – poverty, imminent homelessness, severe medical concerns and mental illness all combine to make Mr. Reardon's life incredibly stressful. He is in a day-to-day struggle to cope with chronic pain and financial stress, all while deeply mentally ill. The outward manifestation of Mr. Reardon's anxiety, impulsivity, and anger is to yell. When he perceives an injustice, either to himself or to others, he speaks up – often very aggressively and loudly. He is not proud of this and has spoken with every therapist he has ever seen to try to reign in his behavior, but when all of these stressors coalesce, his anger boiled over.

*Post-Arrest Conduct*

Mr. Reardon carries tremendous shame and regret for having committed this crime and causing such incredible harm to the employees at the consulate and the members of the Synagogues. From the very moment of his arrest, Mr. Reardon has only wished to plead guilty, accept responsibility for his actions, and apologize to the victims.

In March of 2025, Mr. Reardon participated in and successfully completed the two-part Restorative Justice program offered in this District. He found the program to be deeply moving

and brought him greater clarity in understanding his conduct and the impact he has had on others.[4]

## ARGUMENT

**A SENTENCE OF 9 MONTHS WITH FIVE YEARS' SUPERVISED RELEASE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO EFFECTUATE THE SENTENCING GOALS OF 18 U.S.C. § 3553(a).**

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The First Circuit stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a guideline calculation, and that, at least in the federal context, the federal statutory factors to be considered are "a tapestry of factors, through which runs the thread of an overarching principle [of parsimony]." *See United States v. Rodriguez,* 527 F.3d at 228, citing *Kimbrough,* 562 U.S. at 101. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

> **I.    Our Recommended Sentence Will Fulfill Any Need for Treatment and Achieve Deterrence.**

A 9-month sentence imposed here, upon a man with significant medical issues, who has never been to prison before, sends a significant message of both specific and general deterrence.

---

[4] Letter Confirming Completion of Restorative Justice

The deterrence of continued criminal conduct is certainly a necessary sentencing consideration and often requires determining *how much* incarceration might serve to deter future criminal conduct. Furthermore, Mr. Reardon experienced the immediacy of consequences for his actions when his conditional release was revoked in April. A sentence with an intensive supervision component after a minimally sufficient term of imprisonment better serves the correctional goal while still providing substantial and just punishment.

Mr. Reardon has been involved in extensive psychotherapy in the community for many years. While the Bureau of Prisons may offer some support in this area, his needs are likely outside the scope of most institutions.[5] There is a concern that while incarcerated Mr. Reardon's mental health could deteriorate. Given his diagnoses, a longer prison term could accomplish the opposite effect of the goals of incarceration for a person to come out of prison rehabilitated and better able to follow the law.

## II.   Sentencing Guidelines

While courts must consider the sentencing guidelines, the Supreme Court has held that the Court may not presume that a guideline sentencing range is reasonable, and Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the

---

[5] Despite court mandates, there is a significant lack of access to adequate mental health care in incarcerated settings. About three in five people (**63%**) with a history of mental illness do not receive mental health treatment while incarcerated in state and federal prisons. It is also challenging for people to remain on treatment regimens once incarcerated. In fact, more than **50%** of individuals who were taking medication for mental health conditions at admission did not continue to receive their medication once in prison.
People with mental illness often face challenges to navigating life in a jail or prison. Behaviors related to their symptoms can put them at risk for consequences of violating facility rules, such as solitary confinement or being barred from participating in programming. This underscores the need for appropriate mental health treatment in incarcerated settings. People with mental illness who are incarcerated deserve access to appropriate mental health treatment, including screening, regular and timely access to mental health providers, and access to medications and programs that support recovery. https://www.nami.org/advocacy/policy-priorities/improving-health/mental-health-treatment-while-incarcerated/

purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough*, supra; *Gall v. United States*, 552 U.S. 38 (2007).

*Zero Point Offender*

For several reasons, Mr. Reardon is not eligible for the so-called 'zero-point offender' reduction. U.S.S.G. § 4C1.1. However, he is a person who has never been to prison before. At 60 years of age, this is a shock to the system. It puts his mental health and physical health at great risk and jeopardizes his already precarious housing arrangements. It is likely that upon release, Mr. Reardon will have to go first to a halfway house and then evaluate any employment and housing options from there. This is a daunting task even for the young and able bodied. While we agree that he should not qualify for a reduction as a 'zero-point offender' there are strong reasons why the court can consider a significant variance, in light of the fact that he has no criminal history points and no prior imprisonments, in conjunction with his age and health concerns, in evaluating the appropriate sentence.

*Victim Related Adjustment*

We object to the increase applied pursuant to U.S.S.G. § 3A1.1 as to counts 1, as it is duplicative to element inherently found within that offense. Application note 4, in U.S.S.G. § 4H1.1 explicitly provides for the application.  In a decision rejecting the application of the victim related adjustment in a prosecution pursuant to 18 U.S.C. § 245(b)(2)(A), the Court rejected the increase on similar grounds. "There is no question that the race of the victim (or a defendant's selection of a potential object or victim based on race) is a fundamental element of 18 U.S.C. § 245(b)(2)(A). There is also no question that the Defendant …. selected the James Meredith statue as the target of their actions specifically because of Mr. Meredith's iconic status as the first African–American student enrolled at the University of Mississippi. This type of "race motivated

10

targeting" is the type of behavior Note 4 attempts to address. Nevertheless, the application of Note 4 upward enhancement is inappropriate in this case. If the underlying offense did not already take race into account, there would be no question that the enhancement applied. However, because a fundamental element of § 245(b)(2)(A) is "that the defendant acted, at least in part, because of the race or color of the victim," application of the enhancement in this instance would be duplicative, and, in effect, would penalize the Defendant twice for the same heinous conduct." 128 F.Supp.3d 957, 962 (D-N. Mississippi, 2015, 12-month sentence imposed).  Here, Mr. Reardon is convicted in count 1 because he selected Jewish houses of worship and the Israeli consulate because of the religious orientation of individuals at both locations, making the religion of the victim or the selection of the target because of the religious orientation therein, an element of the offense.

Removing that 3-level increase from the guideline calculation would leave count 1 with an adjusted offense level subtotal of 16, resulting in a ½ unit addition under the grouping rules. U.S.S.G. § 3D1.4(a) and (b) and the total number of units 2, instead of 2.5, and the overall increase in offense level at ¶ 60 would be 2 instead of 3, reducing the total offense level to 22 for a new guideline of 41-51 months.

### III.    A 9 Month Sentence Avoids Unwarranted Sentencing Disparities.

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). A review of U.S. Sentencing Commission data for this type of offense does not yield helpful results. It appears that there were only 3 defendants' nationally whose guideline parameters match those of Mr. Reardon to allow for comparison. With only 3 data points, the risk for the results to skew is very high.

While the probation department cannot identify internally the 3 cases, there appears to be:

1. *United States v. Pietila*, Western District of Michigan. 23-CR-00078. In June of 2023 Mr. Pietila was found to be collaborating with another individual and sent threatening messages directed at a congregation in Lansing, Michigan. His guideline range was 33-41. The messages contained in his case included support for Hitler, allegiance to white supremacist ideologies and various epithets against Jewish people. He received a sentence of 12 months and a day.

Importantly, the JSIN data does not consider defendants' family history, background, or other important mitigating factors, like mental health, medical issues or substance use history. As a result, it may be difficult for the Court to draw easy conclusions from the JSIN data.

## CONCLUSION

For the reasons outlined in this memorandum, Mr. Reardon's mental health crisis, financial turmoil, genuine remorse and the need to pursue meaningful mental health treatment all militate in favor of the imposition of a sentence of 9 months, with 5 years of supervised release, in this case.

Respectfully submitted,

*/s/ Jessica P. Thrall*
Jessica P. Thrall, B.B.O. #670412
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

**CERTIFICATE OF SERVICE**

    I hereby certify that this document was filed through the ECF system to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 8, 2025.

                                        */s/ Jessica P. Thrall*
                                        Jessica P. Thrall